UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Cr. No. 21-10216-DPW |
| | ) |
| TAMARA KHATUNTSEVA | ) |
| | ) |
| Defendant | ) |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorneys, Nathaniel R. Mendell, Acting United States Attorney, and Assistant U.S. Attorney Laura J. Kaplan, submits this sentencing memorandum pursuant to the Court's August 5, 2021 Procedural Order Re: Sentencing Hearing (Docket # 11) and herein requests an evidentiary hearing.

The government recommends a sentence of 12 months and one day; restitution in the amount of $126,319.32; an order of forfeiture (money judgment) in the amount of $123,657.82[1]; 24 months of supervised release; a $100 special assessment; and a fine at the discretion of the Court. This sentence is sufficient, but not greater than necessary, to comply with the purpose of the sentencing guidelines. The government believes a sentence at the low end of the guidelines sentencing range is appropriate since the defendant accepted responsibility early on and has agreed to plead guilty. The government's reasons for recommending such a sentence, pursuant to the goals enumerated in U.S.S.G. § 3553(a), are set forth below.

I.   **Offense Conduct**

---

[1] With regard to the forfeiture money judgment amount, the defendant is not entitled to any credit or offset. See 18 U.S.C. § 981 (b)(2)(A) ("'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense … and is not limited to the net gain or profit realized from the offense").

Looking to the nature and circumstances of the offense, defendant's fraud caused financial harm to the victim and the government's case against her is strong. From December 2018 to August 27, 2020, the defendant purchased high end retail goods from the victim company and fraudulently returned lower value items in their place. Defendant was a repeat customer who was known to most store personnel.  The government's financial investigation revealed that defendant sold the high value items on eBay for hundreds of thousands of dollars. This scheme ended on August 27, 2020, when a search warrant was executed on defendant's residence and vehicle which uncovered 42 items that defendant planned to sell on eBay or fraudulently return to the victim.[2] Defendant admitted to agents that she would purchase items from outlet stores and return different items to the victim in their place. She claimed she would return items to the victim that were not popular to sell online. She would purchase the same red security tags used by the victim in order to fraudulently return different items in the place of their high value look-a-likes. Defendant frequented stores owned by the victim company on a daily basis to search for new items which could be sold online. She created an email account, used two eBay accounts, and opened credit cards in her daughter's name to further her scheme. Defendant admitted that she knew what she was doing was fraud and illegal.

## II.      Guidelines

The parties agree that defendant's base offense level is 7 because the offense of conviction has a statutory maximum term of incarceration of 20 years or more (USSG

---

[2] These items are listed on Exhibit B of the plea agreement and include boxes of shoes, dresses, and white plastic store bags with yellow notes stapled to them containing purses, scarves, and red tags that defendant placed on items that she shipped to people who bought the items off of her eBay site.

§ 2B1.1(a)(1)).  The parties also agree that defendant's offense level is decreased by 2 because defendant accepted responsibility for her crime (USSG § 3E1.1).

In addition to incarceration, the government seeks (1) a fine as calculated by the Court at sentencing, unless the Court finds that defendant is not able, and is not likely to be able, to pay a fine; (2) 24 months of supervised release; (3) a mandatory special assessment of $100; (4) restitution in the amount of $126,319.32; and (5) forfeiture as set forth in the Plea Agreement (Docket # 6).

The government recommends a sentence on the low end of the Guidelines sentencing range.  Defendant agreed to enter a guilty plea early on when confronted with the evidence against her.   The government's sentence recommendation takes into account that the defendant has led a relatively law-abiding life and this was her first serious encounter with the criminal justice system. The defendant has agreed to forfeit her fraudulently procured gains and to provide restitution to the victim which will provide appropriate punishment for her conduct and compensate for some of the losses suffered. Thus, this sentence affords adequate deterrence to further criminal conduct and will protect the public from further crimes by this defendant.

### III.     Loss Amount

The government and defendant agree that defendant made a number of fraudulent returns. However, the parties disagree about the total amount of loss.  The government contends that defendant's offense level is increased by 8 because the loss is more than $95,000 but not more than $150,000 (USSG § 2B1.1(b)(1)(E), and accordingly, defendant's total "Offense level" under the Guidelines is 13. Defendant contends that her offense level is increased by 6 because the loss is more than $40,000 but not more than $95,000 (USSC § 2B1.1(b)(1)(D), and, accordingly, her total "offense level" under the Guidelines is 11.

The United States contends that the total loss amount is $126,319.32.

**A. The Held Items**

Investigators for the victim company provided the FBI with 45 items defendant fraudulently returned to the victim8 (39 of which still remain in dispute). An investigator for the victim company has confirmed and verified, and will testify at a sentencing hearing, that each item held was, in fact, returned by the defendant to the victim.  The defendant was well known to the various victim stores.  Moreover, each store has an entrance and exit camera as well as cameras at the cash registers.  The investigator was able to review the videos and identify the defendant entering/exiting the various stores and making purchases of certain items while subsequently returning other items in their place.  The investigator was also able to determine from receipts, as well as the manner in which security tags were affixed to the returned items, that the items purchased were not the same as those returned.  Moreover, according to the victim, once items are returned that cannot be authenticated, i.e., they are believed to be different from those originally purchased, they cannot be placed back on the storeroom floor for sale and are therefore destroyed. The 45 items held by the victim and turned over to the FBI as evidence have not been destroyed but the victim company has indicated they cannot resell these items and therefore the total loss from these items is $42,739.61[3].

**B.  Defendant's Spreadsheet Items**

In addition, a search of defendant's personal computer produced excel spreadsheets, prepared by the defendant, which detailed thousands of defendant's purchases and returns at the victim company, including descriptions of each item. These spread sheets are being provided to

---

[3] Only 39 of the 45 items held are being included in the loss amount.

4

the Court under separate cover as Exhibit A. The FBI conducted an analysis of these spreadsheets. Some of the items on the spreadsheet describe an item purchased by the defendant and a corresponding identical item subsequently returned. The government cannot prove that these items were fraudulent returns and therefore has not counted these items in the loss amount. However, there were 96 items noted on the spreadsheet, where the description of the item purchased differed from the description of the item returned, and the government alleges that those items were fraudulent returns. An FBI financial intelligence analyst will testify that these 96 documented fraudulent returns constitute an additional loss of $80.918.21. Combining the held items and the spreadsheet items puts the amount of loss at $126,319.32.

### C. The Credit Card Fees

The victim company also pays a credit card fee of 2.02% for each transaction and, therefore, an additional $2,491.05 is added to the loss figure. ($123,319.32. X 2.02% = $2,491.05). Accordingly, the total amount for the held items combined with the information on the defendant's own spreadsheets, plus the credit card fees paid by the victim, is $126,319.32.

This loss amount is not exhaustive, but the government's estimate is certainly reasonable. Additional items were seized pursuant to a search warrant from defendant's residence as can be seen on Exhibit B which are not included in the total loss figure. To the extent that those fraudulent claims are not included in the loss amount, it is due to the extensive nature of the fraud, which encompassed thousands of purchases, approximately one hundred of which the defendant admitted were fraudulent.

### D. Credit Against Loss

The 39 held items totaling $42,739.21 should be counted towards the loss amount because the victim had no alternative but to destroy the items given the victim's knowledge of

defendant's fraud. Representatives of the victim company have represented to the government, and will so testify at a hearing, that they are not permitted to put items back on the floor for resale that cannot be authenticated, and as a result, the items are destroyed. Since the victim company was working with the FBI, they knew that any items returned by the defendant were suspect and could not be resold.

For the same reasons, the items seized from defendant's home cannot be resold and have no value to the victim. As a result, the returned and seized items, which are worthless to the victim, do not result in a credit against loss for restitution purposes. The 96 returned items totaling $80,918.21, which were documented on the defendant's spreadsheet, should also be counted towards the loss amount since these were intended losses caused by the defendant and it is not reasonably practical to determine how much money, if any, the victim would have received from the return and resale of these items. Finally, the credit card fees charged to the victim totaling $2,491.05 should be considered part of the loss amount because the credit card fees were not returned to the victim. As the Court can see, calculating the loss amount is complicated but solely attributable to the extensive and pervasive fraud on the part of the defendant.

Here, restitution is mandatory under the Mandatory Victims Restitution Act ("MVRA"). 18 U.S.C. § 3663A. The government's request for restitution in the amount of $126,319.32 is also proper under applicable law, because it is "record-based and constitutes a fair appraisal of [the victim's] actual losses." *United States v. Gonzalez-Calderon*, 920 F.3d 83, 85 (1st Cir. 2019) (quoting *United States v. Naphaeng,* 906 F.3d 173, 182 (1st Cir. 2018)). Although the government bears the burden of establishing the restitution amount, *see* 18 U.S.C. § 3664(e), "[a] district court's calculation of restitution is not held to standards of scientific precision," but rather

requires only "a rational basis in the record." *Gonzalez-Calderon*, 920 F.3d at 85 (internal quotations and citations omitted); *see also Naphaeng*, 906 F.3d at 179 (restitution award may be supported by "a modicum of reliable evidence"). Further, the district court may make "a reasonable determination of appropriate restitution by resolving uncertainties with a view towards achieving fairness to the victim," *United States v. Alphas*, 785 F.3d 775, 787 (1st Cir. 2015) (quoting U*nited States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005)).

While it is generally the government's burden at sentencing to show the loss due to fraud, "where the government has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate. Otherwise, the district court may reasonably treat the entire claim for benefits as intended loss." *United States v. Hebron*, 684 F.3d 552, 563 (5th Cir. 2012) (citing *United States v. Fisk*, 233 Fed. Appx. 371 (5th Cir. 2007)); *See also* 18 U.S.C.A. § 3664(e) ("The burden of demonstrating such other matters as the court deems appropriate shall be upon the party designated by the court as justice requires."); *Burdi*, 414 F.3d at 222 (1st Cir. 2005) (holding that government's evidence of the value of an item for restitution was enough to require defendant to counter it with his own evidence); *Alphas*, 785 F.3d at 784 ("where a defendant's claims were demonstrably rife with fraud—a sentencing court may use the face value of the claim as a starting point in computing loss…The burden of production will then shift to the defendant, who must offer evidence to show (if possible) what amounts represent legitimate claims.")(citing *Hebron*, 684 F.3d 552).

Defendant's fraud was extensive and pervasive. It occurred over multiple years, involved several different bank accounts and eBay accounts, numerous stores throughout the state, daily trips to the victim stores, thousands of purchases and returns, and hundreds of thousands of

dollars. Because the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden falls to defendant to prove that particular returns were legitimate. However, defendant cannot meet that burden and instead claims, among other things, that certain items were returned using the wrong receipt by accident, that she does not remember certain transactions, that the credit card fees should not be included since she erroneously asserts that these fees were refunded, that some items may have been returned to shelves at an unknown price, and that some of the fraudulent returns were accidental.

Clearly, some of the losses to the victim can never be known. Retail stores face all kinds of costs associated with selling returned items including "the time and money spent on simply processing the return itself, restocking returned merchandise, reevaluating its worth, or determining where, how, or even if it can be resold." Caroline Cardone & Read Hayes, "The Evolving Impact of Return Fraud and Abuse," Loss Prevention Magazine (Aug. 2, 2017), https://losspreventionmedia.com/the-evolving-impact-of-return-fraud-and-abuse/. A fraudulently returned item that is resold rather than destroyed is not a windfall for the otherwise victim retailer. The defrauded retailer does not break even on a returned item that is resold and they are not made whole by a fraudster who returned an item that, due in no part to the fraudster, was able to be resold.

Because defendant's fraud was so extensive and pervasive that it would not be reasonably practicable for the government to sort out among the hundreds of returns which were fraudulent and which were legitimate, it is the defendant's burden to produce evidence refuting same. If the defendant cannot meet that burden, the total loss of $126,319.32 sought by the government should be considered as an intended loss.

Even if the Court were to put aside the loss the victim suffered when they had no choice but to destroy the fraudulent returns rather than restock those that could not be authenticated, and even if the victim had its credit card fees refunded upon the return of the items, what is critical is the defendant's intent. In *United States v. Goldstein*. 442 F.3d 777 (2nd Cir. 2006), a hotel employee fraudulently charged people for rooms they did not stay in. Defendant argued that since the victims ended up getting their credit card charges refunded by their credit card companies, the refunded amount should be subtracted from their total harm.  The Second Circuit disagreed and held that the loss should be "measured at the moment the credit cards were charged." *Id.* at 784. In other words, defendant should not be credited for his victims' efforts to mitigate their loss since his fraud was complete upon the transaction. Similarly, had the victim here been able to restock or resell some of the fraudulently returned items and been refunded for the credit card fees, the loss amount would be the same since the return should be measured from the moment the items were fraudulently returned and the victim's independent efforts to mitigate their loss should not be counted in her favor.

Similarly, for the purposes of credit against loss, "the loss may be reduced only by the amount actually recovered or by the amount that is recoverable at the time of sentencing, whether or not the defendant had any idea what the collateral's value would be by that time." *United States v. Mallory*, 709 F. Supp. 2d 455, 458 (E.D. Va. 2010).[4] In *Mallory*, defendant defrauded lenders into issuing mortgage loans to unqualified homebuyers who later ended up

---

[4] With regard to the forfeiture money judgment amount, the defendant is not entitled to any credit or offset.  *See* 18 U.S.C. § 981 (b)(2)(A) ("'proceeds' means property of any kind obtained directly or indirectly, as the result of the commission of the offense … and is not limited to the net gain or profit realized from the offense").

defaulting in the 2008 housing market crash. *Id.* The district court rejected defendant's argument that his credit against loss should be based on the value of the homes before the market crash. *Id.*

Here, even defendant's subjective belief that the items would be resold at full value or even ambiguity as to what could be recovered by the victim cannot be resolved in defendant's favor. Putting to one side the complexity involved in actually calculating the true loss of the items that were returned and potentially restocked, the defendant's calculation does not factor in any loss at all on a returned item. The total loss must include the deteriorated value of any items that were returned which the defendant has failed to do.

IV. **Conclusion**

A sentence of 12 months and one day will afford adequate deterrence, protect the public from further crimes of the defendant, promote respect for the law, and provide just punishment for the offense. For these reasons, the government believes that a sentence at the low end of the guidelines sentencing range of 12 months and one day is not greater than necessary but is sufficient to protect the public and send a message to the defendant. In addition, the government seeks forfeiture in the amount of $123,657.82, restitution in the amount of, $126,319.32, a term of supervised release of 24 months, a special assessment of $100, and a fine at the discretion of the Court.

Respectfully Submitted,

NATHANIEL R. MENDELL
Acting U.S. Attorney

By: */s/ Laura J. Kaplan*
Laura J. Kaplan
Assistant U.S. Attorney

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                           */s/ Laura J. Kaplan*
                                           Laura J. Kaplan
                                           Assistant United States Attorney

Date: November 29, 2021