**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

UNITED STATES OF AMERICA          )
                                  )
                                  )
v.                                )
                                  )          Criminal No. 21-10216-DPW
TAMARA KHATUNTSEVA,               )
                                  )
                     Defendant.   )
_____)

## DEFENDANT TAMARA KHATUNTSEVA'S SENTENCING MEMORANDUM

## INTRODUCTION

Tamara Khatuntseva, a 62-year-old refugee from the Soviet Union with no prior criminal record, has pled guilty to one count of wire fraud for returning items to TJMaxx that were either bought elsewhere or were bought at TJMaxx beyond the 30-day return window. Most of the items returned by Ms. Khatuntseva were of similar value to the purchased items whose receipts Ms. Khatuntseva used to make the returns.

The government and Ms. Khatuntseva dispute the amount of the U.S.S.G. "loss," with the government contending that it is $126,319.32[1] (leading to an offense level of 13) and Ms. Khatuntseva contending that it is $42,468.89 (leading to an offense level of 11). Regardless of which level the Court ultimately agrees is correct, for the reasons set out below, Ms. Khatuntseva believes that a below-Guidelines sentence of probation, with no fine, and a restitution order of $25,734.87 is appropriate, and she respectfully requests that the Court so sentence her.

---

[1] This number has been adjusted downward by the government since the government submitted its Statement of Offense to the Probation Department.

## DISCUSSION

### A.  Ms. Khatuntseva's Background[2]

Ms. Khatuntseva has not had an easy life.  She grew up in the U.S.S.R., where she lived until she was 34 years old. There, she experienced the deprivations that were endemic throughout much of Soviet society and suffered under Soviet anti-Semitism. Although she was a gifted math student holding the equivalent of a master's degree, because she was Jewish, Ms. Khatuntseva was denied the opportunity to further her studies. Fortunately, she was able to immigrate to the United States as a refugee with her then-husband, four-year-old daughter, and parents in 1993. After being granted asylum, Ms. Khatuntseva and her family eventually settled in Newton, Massachusetts and, in 2000, she became a naturalized U.S. citizen.

Ms. Khatuntseva and her husband worked hard and were finding success, but her "American Dream" collapsed due to her husband's alcoholism, severe mental illness and infidelity. After a painful divorce, a bankruptcy filing, and becoming a single mother who also cared for her elderly and increasingly infirm parents, Ms. Khatuntseva fell into a deep depression.

In 2001, Ms. Khatuntseva started an online travel agency, Sea Cruise International Travel Agency, Inc. ("SCITA"). Through SCITA, Ms. Khatuntseva worked from her home booking cruises for individuals and groups. The travel agency generated enough revenue to support Ms. Khatuntseva and her daughter until about 2012, when she took a part-time position as an after-school math tutor at the Russian School of Math ("RSM") in Newton. She was forced to give up her position at RSM, however, when her elderly parents, with whom she was very close, became

---

[2]  Ms. Khatuntseva's background is spelled out in more detail in the Pre-Sentence Report ("PSR") and in a letter that she will be submitting to the Court.

ill, and she cared for them until their deaths in 2016 and 2017. Their deaths led to the resurfacing of her depression from which she ultimately recovered.

**B.  Ms. Khatuntseva's E-Commerce Sales Business**

In about 2015, to supplement the income she earned from SCITA (a business that was declining due to the increased ability of individuals to make their own travel arrangements over the internet), Ms. Khatuntseva began a side business (hereinafter the "E-Commerce Sales Business") of purchasing high-end clothing and accessories, such as shoes, scarves, belts and handbags, from outlet and bargain stores and re-selling these items on various internet sites. To do so, she purchased such items from TJMaxx and other retailers, such as outlet stores, and marketed them on sites such as eBay. In most cases she was able to sell the items for more than she had paid for them. Ms. Khatuntseva's online sales were entirely lawful, and the government has not alleged that Ms. Khatuntseva ever sold any item that was inauthentic, counterfeit or in any way different than the item she advertised it to be.

If Ms. Khatuntseva was unable to sell the items she had purchased from TJMaxx, she usually returned such items to TJMaxx, which accepted returns within 30 days of the date of purchase. As a result, Ms. Khatuntseva had a high volume of purchases and of returns at TJMaxx. Due to the fact that the return window was narrow, sometimes Ms. Khatuntseva returned items if she was unable to sell them within the return period and immediately re-purchased them in order to extend the return period.  To Ms. Khatuntseva's knowledge, TJMaxx did not have a policy that prevented a buyer from returning and re-purchasing items, and the government has not claimed otherwise. The vast majority of the returns Ms. Khatuntseva made to TJMaxx were legitimate returns made within the 30-day return period.

To keep track of her inventory and sales, Ms. Khatuntseva recorded her purchases and sales on an Excel spreadsheet that she maintained on her personal computer. Ms. Khatuntseva also recorded the returns that she made on the same spreadsheet. The returns were on a separate page of the spreadsheet and, when recording returns, at times she cut-and-pasted the same language she had used to describe the item on the list of purchases. At other times, rather than search through the spreadsheet (which listed thousands of transactions over a multi-year period) for the original record of the purchase, she simply recorded another, usually similar, description of the item. Ms. Khatuntseva did not expect or intend that anyone else would rely on the spreadsheet as a record of her E-Commerce Sales Business transactions.

**C. Facts Supporting Ms. Khatuntseva's Conviction for Wire Fraud**

Although she made nearly 900 legitimate returns in connection with her E-Commerce Sales Business, Ms. Khatuntseva returned a number of items to TJMaxx after the return window had closed and did so by using a receipt related to the purchase of a different item that was still within the 30-day return period. At other times, Ms. Khatuntseva "returned" items to TJMaxx that she had purchased at the Gucci Outlet (which did not accept returns), using a receipt related to the purchase of a similar item from TJMaxx.[3] In order to do so, she removed the original TJMaxx or Gucci Outlet tag from the item and replaced it with the TJMaxx tag of an item that could be returned consistent with TJMaxx's return policy. When she returned such items to TJMaxx, the store refunded the purchase price reflected on the receipt of the item that had been purchased within the past 30 days. In most cases, Ms. Khatuntseva returned items that she believed to be of the same or similar value to the item she had purchased with the receipt used in

---

[3] The majority of items Ms. Khatuntseva admits were part of fraudulent returns to TJMaxx had been purchased at TJMaxx.

the return transaction, although in some cases she returned items that cost less than the amount she was refunded.

Ms. Khatuntseva admits and accepts responsibility for 83 of the 135 returns that the government claims were fraudulent.

**D. Amount of Loss for Sentencing Guidelines Purposes**

1. Factual Background Concerning the Amount of Loss

Although Ms. Khatuntseva admits and accepts responsibility for having made 83 fraudulent returns to TJMaxx (and receiving refunds for those returns totaling $73,256.79), she disputes the government's allegations that 52 other specific returns (for which she received refunds totaling an additional $51,851.52[4]) were fraudulent. Until the Court determines whether those disputed returns were fraudulent, the amount of U.S.S.G. "loss" cannot begin to be established. (As discussed below, in determining the "loss", Ms. Khatuntseva contends that she is also entitled to certain credits against the face-amount of the refunds she received for fraudulent returns.)

Pursuant to Fed.R.Crim.P. 32(i)(2), Ms. Khatuntseva requests an evidentiary hearing on the issue of loss.

There are two categories of returns Ms. Khatuntseva made that the government alleges were fraudulent, and Ms. Khatuntseva expects that the government's proof with respect to items in those categories will be different from one another.

a. Spreadsheet Transactions

As set forth above, Ms. Khatuntseva maintained a spreadsheet on which she recorded details of her sales, purchases, and returns ("the Spreadsheet"). The government obtained the

---

[4] Ms. Khatuntseva's dollar calculations differ slightly from the government's calculations.

Spreadsheet when it seized Ms. Khatuntseva's computer during the execution of a search warrant at Ms. Khatuntseva's apartment in August, 2020. The Spreadsheet listed more than one thousand return transactions over an approximately three-year period.

Ms. Khatuntseva and the government disagree as to whether 41 of the return transactions on the Spreadsheet (referred to herein as "Spreadsheet Transactions") are fraudulent. To Ms. Khatuntseva's understanding, the government's claim that such transactions are fraudulent is based entirely on the language used in the Spreadsheet itself to describe the items that were returned. In other words, Ms. Khatuntseva believes, the government will offer no evidence other than the Spreadsheet itself to support its claims that the disputed Spreadsheet Transactions were fraudulent.

An affidavit from Ms. Khatuntseva, in which she explains item-by-item why she believes the 41 disputed Spreadsheet Items were legitimate returns, is filed herewith. With only a few exceptions, the explanations fall into six categories, which are discussed below: Each of these transactions – and the reasons Ms. Khatuntseva maintains they are not fraudulent – are addressed in more detail in Ms. Khatuntseva's accompanying Affidavit.

i.  With respect to 32 of the items at issue, the photos demonstrate that both descriptions in Ms. Khatuntseva's Spreadsheet (i.e., the description of the purchased item and the description of the returned item) are consistent with the item itself. (With respect to most, but not all, of the transactions listed below, Ms. Khatuntseva has an independent memory of the items that she purchased and returned. A few examples are set forth below; the full explanation as to each of the items in this category is contained in Ms. Khatuntseva's *Affidavit*.

| Row | Description of Purchased Item | Description of Returned Item | Photo of Item |
|---|---|---|---|
| 2[5] | Celine light gray nano luggage bag | Celine beige nano luggage bag |  [stock photo] |
| **Explanation:** Both "light gray" and beige" accurately describe the same color. | | | |
| 4 | Chloe brown floral dress # 38 | Chloe orange/black dress # 38 |  [actual item] |
| **Explanation:** Description of print as opposed to color used to describe dress. | | | |
| 14 | DG floral silk elastic waist midi dress # 42 | DG elastic waist peony print dress |  [actual item] |
| **Explanation:** Photo matches both descriptions. | | | |

ii. Two of the Spreadsheet Transactions were identified by the government as fraudulent apparently because the return transactions appear on Ms. Khatuntseva's spreadsheet twice. There was a date on which Ms. Khatuntseva planned to return four items and she recorded the transactions on her Spreadsheet before making the actual returns. However, she subsequently decided not to make those returns and made a note on her Spreadsheet that she had not returned the items at issue. With respect to two of the transactions, Ms. Khatuntseva did eventually make the return on a later date. It appears the government

---

[5] The row for each transaction correlates to the Spreadsheet the government provided to Ms. Khatuntseva on August 13, 2021, in which it identified the transactions it maintained were fraudulent. That spreadsheet is attached as Exhibit A to Ms. Khatuntseva's *Affidavit*, filed herewith.

concluded that she made each return twice, because it recorded the notation "(Returned twice)" next to the description of those items on the spreadsheet it provided to Ms. Khatuntseva's counsel (see <u>Exhibit A</u> to Ms. Khatuntseva's *Affidavit*). To be clear, Ms. Khatuntseva did not record "(Returned twice)" on her own spreadsheet in connection with these transactions. The transactions at issue are as follows:

| Row | Description of Purchased Item | Description of Returned Item |
|---|---|---|
| 69 | Gucci Red bamboo heel shoes # 37.5 (2019) | Gucci Red bamboo heel shoes # 37.5 (Returned twice) |
| 98 | Gucci black Dionysus bag | Gucci black small Dionisus bamboo bag (Returned twice) |

iii. Two Spreadsheet Transactions the government maintains are fraudulent involve the alleged return of one type of item for another. In fact, it was not possible for a customer to return a different type of item than had been purchased, such as returning a belt using a receipt for the purchase of a scarf. Furthermore, when Ms. Khatuntseva made a return to TJMaxx, the sales clerk used a scanner to scan the price tag of the item she was returning and the scanner identified to the sales clerk the *brand (designer name)* and *type* of item to which the tag pertained. Accordingly, if a customer attempted to return an item bearing the tag of a different type or brand item it would be obvious to the sales clerk that the return was fraudulent and the return would be refused. Accordingly, Ms. Khatuntseva believes these entries on the spreadsheet contain mistakes she made in matching the purchased item with the returned item:

[THIS SECTION LEFT BLANK INTENTIONALLY]

| Row | Description of Purchased Item | Description of Returned Item |
|---|---|---|
| 50 | Gucci GG canvas tiger head buckle belt | Gucci black Octopus scarf |

| Row | Description of Purchased Item | Description of Returned Item |
|---|---|---|
| 55 | Gucci GG Torchon black/red trim belt # 75- 28 | Fendi white medium Kan I bag |
| **Explanation:** In this return, the item type (belt vs. handbag) and brand (Gucci vs. Fendi) are both different. Also, TJMaxx tags bear the name of the designer and the tag would have indicated that the item was Gucci, not Fendi. | | |

iv. There is one item on the Spreadsheet that is a duplicate of another Spreadsheet

Transaction which Ms. Khatuntseva admitted was fraudulent. This transaction was listed

twice on the Spreadsheet because Ms. Khatuntseva recorded it before she made the return

the first time, in connection with the returns discussed in paragraph (ii), above, then

decided not to return it on that date (and, in fact, made a note on her Spreadsheet that she

had not returned it), although she did return it on a later date. Thus, Ms. Khatuntseva does

not dispute that the return transaction was fraudulent, but disputes that it was actually two

separate transactions.

| Row | Description of Purchased Item | Description of Returned Item |
|---|---|---|
| 97 | Gucci large Ophidia tote bag | Gucci Trapuntata silver shoulder bag (Returned twice) |
| 98 | Gucci large Ophidia tote bag | Gucci Trapuntata silver shoulder bag (Returned twice) |

v. Two items on the Spreadsheet have identical descriptions of the items purchased and

returned in the two transactions. Ms. Khatuntseva does not know why the government

claims these return transactions were fraudulent.

| Row | Description of Purchased Item | Description of Returned Item |
|-----|------------------------------|------------------------------|
| 35 | Gucci black Marmont espadrilles slides # 36.5 | Gucci black Marmont espadrilles slides # 36.5 |
| 91 | Valentino red rockstud belt bag | Valentino red rockstud belt bag |

As is set forth above and in more detail in Ms. Khatuntseva's Affidavit, with respect to the Spreadsheet Transactions, the government has failed to meet its burden of proving by a preponderance of the evidence that any of the disputed items are fraudulent transactions. Ms. Khatuntseva should be held responsible only for the 55 Spreadsheet Transactions she has admitted were fraudulent. Those transactions resulted in refunds to her totaling $41,066.58. In determining the U.S.S.G. "loss" associated with those transactions, Ms. Khatuntseva should be given certain credit against the $41,066.58, as discussed below.

> b. Items Held by TJMaxx ("Held Items")

The second set of transactions at issue are those which TJMaxx identified as fraudulent at or near the time of the transaction and for which they set aside the returned item and provided it to the government as evidence of the fraud. Such returned items are referred to herein as the "Held Items Transactions." Ms. Khatuntseva was permitted to examine the Held Items, which are now in government custody. (Ms. Khatuntseva has agreed to forfeit those items notwithstanding that she does not own them inasmuch as they are owned by TJMaxx.) Ms. Khatuntseva admits that 28 of the Held Item Transactions are fraudulent but disputes that the remaining 11 Held Item Transactions were fraudulent. As set out in Ms. Khatuntseva's affidavit, Ms. Khatuntseva believes that she never purchased and, accordingly, never returned the 11 items at issue. Those items do not appear on her Spreadsheet as items she purchased or returned, unlike

almost all of the other items to which she admits, and they are not consistent with the brands or types of items she typically purchased for her E-Commerce Sales Business.

Ms. Khatuntseva maintains that the government will not be able to meet its burden of proving the 11 disputed Held Items Transactions were fraudulent. With respect to the 28 Held Items that Ms. Khatuntseva admits she fraudulently returned, she was refunded $30,739.72 by TJMaxx, although in determining the U.S.S.G. loss, there should be a credit against that amount as discussed below.

    2. In determining the U.S.S.G. "Loss," Ms. Khatuntseva should be given a credit against the amount of money that was refunded to her by TJMaxx for fraudulent transactions.

In determining the U.S.S.G. "Loss", Ms. Khatuntseva should be given a credit against the amount of money that was refunded to her by TJMaxx for fraudulent transactions.

The government has alleged that Ms. Khatuntseva returned items of lesser value than the items she had purchased, resulting in her obtaining a refund of more money than she had paid for the returned item. It refers to the products she returned as "inferior" or "worth less money."[6] While it is likely that there was a difference in the value of some the items she returned, as is set forth above, because Ms. Khatuntseva could return only like items and due to the oversight TJMaxx exercised over the return process, the actual difference in value would have been small.

On information and belief, Ms. Khatunseva was under surveillance by TJMaxx during the period when the Spreadsheet Transactions were made, yet TJMaxx did not identify the Spreadsheet Transactions as fraudulent at that time (or, in fact, has it ever done so). Furthermore, there is no evidence that TJMaxx (a) did anything with the returned items other than to re-sell them to other customers or (b) was unable to sell those items for the price on the price tag. In

---

[6] There is no allegation that Ms. Khatuntseva returned items that were counterfeit, nor did she do so.

fact, Ms. Khatuntseva would testify that on several occasions when she made returns, the TJMaxx sales personnel put the handbag she was returning back on the sales floor to re-sell, with the tag on it that Ms. Khatuntseva had affixed to it, while Ms. Khatuntseva was still in the store (Ms. Khatuntseva cannot say whether that happened in connection with any of the returns that have been identified as fraudulent). Thus, Ms. Khatuntseva believes it is fair and reasonable to assume that TJMaxx was able to sell all of the Spreadsheet Transaction items Ms. Khatuntseva returned for the amount that it refunded to her.

a. Spreadsheet Transactions

The government has informed Ms. Khatuntseva's counsel that it will produce no evidence concerning what happened to the items returned in the Spreadsheet Transactions after Ms. Khatuntseva returned them; in other words, the government's only evidence is the Spreadsheet itself. There is no evidence that TJMaxx did not simply return the items to the sales floor and sell them for the amount identified on the sales tag, which is the same amount it refunded to Ms. Khatuntseva.

There is no evidence that the items Ms. Khatuntseva returned to TJMaxx were inauthentic (nor would there be since she had purchased most of them from TJMaxx itself). Moreover, there is no evidence that TJ Maxx did not receive from the final buyer of those items the same amount that it refunded to Ms. Khatuntseva. Accordingly, because she provided to TJMaxx an item of equal or near equal value at the time of the transaction – well before TJMaxx or the government was aware of the fraud – Ms. Khatuntseva is entitled to a credit for at least some of the proceeds for those sales, consistent with U.S.S.G.§ 2B1.1, cmt. n.3(E)(i). Ms. Khatuntseva submits that a credit of 60% of the amount refunded to her is a reasonable amount given the circumstances.

Application Note 3(E)(i) to U.S.S.G. § 2B1.1(b)(1) provides an offset from the amount of loss for:

> [t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim *before the offense was detected. The time of detection* of the offense *is* the earlier of (I) *the time the offense was discovered by a victim* or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency. (emphasis added)

"[W]hat is determinative under the Guidelines is the time of detection of the offense by either the victim or the government." U.S. v. Maisonet-Gonzalez, 785 F.3d 757, 763 (1st Cir. 2015). Here, Ms. Khatuntseva returned items of value to TJMaxx before either TJMaxx or the government was aware the transactions in dispute were fraudulent. Indeed, the government did not even become aware of the transactions themselves until it seized her computer on August 27, 2020 and subsequently found the Spreadsheet on it. Accordingly, Ms. Khatuntseva made the disputed returns (and provided to TJMaxx an item of identical or similar value) well before the crimes were detected and, pursuant to U.S.S.G.§ 2B1.1, cmt. n.3(E)(i), she is entitled receive a credit for at least some of the value of the items she returned. *See, e.g.*, U.S. v. Anders, 333 Fed.Appx. 950, 954-955 (6th Cir. 2009)(in construction contract bidding fraud case, court held defendant was entitled to credit against loss for value of services rendered under the contract that was obtained by fraud); U.S. v. Klein, 543 F.3d 206, 213-214 (5th Cir. 2008)(in insurance fraud case in which physician billed insurers for administering medication that the patients actually self-administered, court held physician was entitled to credit against loss for value of drugs dispensed and noting that failure to discount the loss as such was a procedural error that constitutes an abuse of discretion); U.S. v. Executive Recycling, 953 F.Supp.2d 1138, 1152 (D.Colo. 2013)(in case involving fraudulent electronics recycling scheme, court held defendant were entitled to

offset for the fair market value of the legitimate services they provided). *See also* <u>U.S. v. Prange</u>, 771 F.3d 17, 36 (1st Cir. 2014), discussed in Section F.1 below.

If the Court agrees that a credit consisting of 60% the value of the items Ms. Khatuntseva returned to TJMaxx and agrees with Ms. Khatuntseva that she is not responsible for the disputed Spreadsheet Transactions, the amount of loss with respect to the Spreadsheet Transactions is $16,426.63 (40% of $41,066.58).

      b.  <u>Held Item Transactions</u>

Ms. Khatuntseva is also entitled to a credit for the value of the Held Items. Ms. Khatuntseva expects that the government will take the position that she is not entitled to any credit for the Held Items because, having concerns about the items' provenance and authenticity, TJMaxx has concluded it cannot sell them. However, on information and belief, one can authenticate designer handbags or clothing for approximately $20-30 per item (see *https://authenticatefirst.com/authentication-options* or *https://realauthentication.com/services/*). Thus, for less than $1,200, one could authenticate all 28 of the Held Items Ms. Khatuntseva is responsible for and potentially confirm their value at $30,739.72. The fact that TJMaxx has determined it is not cost-effective to re-sell the Held Items or otherwise chose not to do so does not make them value-less. Ms. Khatuntseva believes it is reasonable to credit her for at least 20% of the value of those items whether TJMaxx takes them as a donation to a charity or a loss on its taxes, which would result in the loss amount for the Held Items being $24,591.77 (80% of $30,739.72).

      c.  Total Loss Amount

For the reasons set forth above, Ms. Khatuntseva contends the total loss amount in this case is $42,468.89 ($24,591.77 for the Held Items + $16,426.63 for the Spreadsheet items + $1,450.49 for credit card charges that TJMaxx incurred).

**E.  Guidelines Calculation**

Pursuant to U.S.S.G. §2B1.1(b)(1)(D), Ms. Khatuntseva's Guidelines Total Offense Level ("TOL") should be 11, taking into account the agreed-upon Base Offense Level of 7, an increase of 6 levels for the amount of loss ($42,468.89),[7] and a decrease of 2 levels for acceptance of responsibility. (Plea Agreement, Doc. # 6, ¶ 3.)  The government agrees with this calculation except that it believes that the Loss exceeds $95,000 and, accordingly, the Base Offense Level of 7 should be increased by 8 levels (rather than 6) and the TOL should be 13 (rather than 11).

Ms. Khatuntseva has no prior criminal record and, accordingly, has a Criminal History Category of I.

**F.  The Appropriate Sentence**

Although at either TOL 11 or TOL 13, the recommended sentencing range involves some period of incarceration. Ms. Khatuntseva believes that, under all the circumstances presented in this case, the Court should depart and/or vary from the recommended range and give Ms. Khatuntseva a sentence of probation.

---

[7]  Pursuant to the Loss table found at U.S.S.G. §2B1.1(b)(1), the Base Offense Level of 7 should be increased by 6 levels if the Loss is greater $40,000 but not more than $95,000; and by 8 levels if the Loss is greater than $95,000 but not more than $150,000.

1.  <u>Grounds for Downward Departure under U.S.S.G. §2B1.1, comment. (n. 21(C))</u>

The Court may grant a downward departure under U.S.S.G. §2B1.1, comment. (n.21(C))

if "the offense level determined under this guideline [Section 2B1.]1 substantially overstates the

seriousness of the offense." Ms. Khatuntseva contends that particular downward-departure

ground applies here.

Ms. Khatuntseva admits that she committed fraud when she returned items to TJMaxx

using receipts from the purchase of a different item and changing tags on the returned

merchandise to facilitate the return transaction. Yet, the fraud involved in this case is simply of a

different nature from the type of fraud that often comes before the Court. Ms. Khatuntseva did

not make the returns with the intention of depriving TJMaxx of the money that was refunded to

her in those transactions. She returned items of like value to the items for which she was

receiving a refund. She expected that TJMaxx would re-sell these items to other customers, who

would be getting genuine, high-value designer items. In retrospect, of course, she realizes that

this belief was misguided, and she is remorseful and embarrassed to have committed the offense.

But, even knowing her acts constituted fraud, all fraud is not the same and the difference

between the fraud Ms. Khatuntseva committed in this case and fraud committed by an offender

who sets out to deprive the victim of the full value of the money s/he can obtain from them is an

important reason why departures from the Guidelines sentences are permitted.

<u>U.S. v. Prange</u>, 771 F.3d 17, 36 (1st Cir. 2014), although not a downward-departure case,

is particularly on point for the proposition that there are two different types of fraud, and one

kind is more harmful and more wrongful than the other:

> In calculating loss based on fraud, we have long recognized that there are two
> types of fraud: "The first type of fraud implicates the 'true con artist,' ... who
> intends only to pocket the money without rendering [anything] in return. The
> second type of fraud involves a person who would not have attained the contract

or loan but for the fraud, but who fully intends to perform." *United States v. Blastos,* 258 F.3d 25, 30 (1st Cir. 2001) (quoting *United States v. Haggert,* 980 F.2d 8, 12–13 (1st Cir. 1992)); *see also United States v. Smith,* 951 F.2d 1164, 1167 (10th Cir. 1991) ("A thief who steals $100,000 is more culpable than a salesman who obtains $100,000 by selling a victim an $80,000 house he fraudulently represents as being worth $100,000. In the latter case, it makes no sense to suggest that $100,000 is the accurate measure of the victim's loss."). Yet, by holding Defendants responsible for the full amount of the fraudulent transactions simply because they knew the transactions were fraudulent, the PSR's response to Defendants' objections would render the distinction between these two types of fraud illusory.

As with the defendant in <u>Prange</u>, Ms. Khatuntseva is not a "true con artist" who defrauded a victim without rendering anything in return. In most cases she returned items of the same or nearly the same value as the item purchased with that receipt. In most cases, the items she returned had been purchased from TJMaxx and the returns would have been legitimate had they been made within the 30-day return period.

While Ms. Khatuntseva's conduct was unlawful, the degree of wrongfulness and moral culpability of the misconduct in which she engaged is not at the same level as if she had defrauded TJMaxx and provided nothing of value in return, e.g., if she had returned counterfeit goods. One way to correct for that difference is with a downward departure under comment n. 21(C) to U.S.S.G. §2B1.1.

2. <u>Request for Variance</u>

If the Court concludes that a departure from the sentence calculated under the Guidelines, pursuant to §2B1.1, comment. (n.21(C)), is not warranted, Ms. Khatuntseva respectfully submits that, after considering the factors specified in 18 USC § 3553(a), the Court should refrain from imposing the Guidelines sentence and, instead, impose a sentence of probation.

According to the U.S. Sentencing Commission's Sourcebooks of Federal Sentencing Statistics for the years 2015- 2019, more than 50% of sentences for fraud offenses were below

the Guideline range. The mean sentences imposed on fraud offenders nationwide in 2018 and 2019 were more than 50% below the low end of the Guidelines range. Ms. Khatuntseva recognizes the seriousness of her crime and does not seek to minimize its effect on TJMaxx, but respectfully submits that the Sentencing Guidelines range for the offense, and the offender, is unduly harsh.

(a) The History and Characteristics of the Defendant (18 USC § 3553(a)(1))

Ms. Khatuntseva, who is nearing the age of retirement, has lived her entire life – more than six decades – without involvement with the criminal justice system. As is set forth in detail in the PSR and in the letter she will submit to the Court, throughout her life she has overcome significant obstacles and worked hard to support herself and her family. In the years leading up to this offense, she had built two small businesses that enabled her to support herself with few luxuries. She is not a career criminal or even someone likely to re-offend. This offense was an aberration and the product of a serious lapse in judgment, made in connection with her struggle to keep her small E-Commerce Sales Business afloat. This explanation is not intended as an excuse but to place her case in context as compared to other fraud cases and other fraud-doers.

(b) The Nature and Circumstances of the Offense (18 USC § 3553(a)(1))

As is set forth in connection with Ms. Khatuntseva's request for a departure, her offense differs from one in which the offender commits a crime with the intent to deprive a victim of large sums of money. However misguided it was, Ms. Khatuntseva believed TJMaxx received full value or close to it for the amounts it refunded to her, in the form of the items she provided to TJMaxx in the return transactions. While it does not excuse her conduct, Ms. Khatuntseva did not generate a large profit from the fraudulent returns because she generally returned to TJMaxx items of like value to the amount TJMaxx refunded to her. Though there were some items she

returned for which she had paid less than was refunded to her, the majority of the transactions involved her receiving a refund of the amount akin to what she had paid for the item she returned.

Though it is not an excuse, unlike so many fraud cases before this Court (see discussion below), Ms. Khatuntseva's crime was not driven by greed. We respectfully submit that the Court can and should take that fact into account in fashioning an appropriate sentence.

> (c) The Need for the Sentence Imposed (i) to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and to Provide Just Punishment for the Offense; (ii) to Afford Adequate Deterrence to Criminal Conduct; and (iii) to Protect the Public from Further Crimes of the Defendant (18 USC § 3553(a)(2))

A sentence of probation with an order of restitution is adequate "(i) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] (ii) to afford adequate deterrence to criminal conduct." Such a sentence needs to be looked at in the context of the substantial punishment – indeed, substantial damage to her life – that this case has resulted in for Ms. Khatuntseva.

First, she will now have a felony criminal record with all the moral, reputational and actual implications that holds.

Second, at 62-years-old, her modest savings have been wiped out in legal fees, and her future prospects for generating income is questionable.  Her travel agency is dormant, perhaps dead. Her ability to revive her E-Commerce Sales Business is questionable if not doubtful.  Her felony conviction will likely make it difficult to get a job. Ms. Khatuntseva is currently receiving food stamps and living off credit cards.

Third, compounding her financial distress and making it much more difficult to crawl out of her financial hole, she will owe restitution to TJMaxx in an amount to be determined by the Court.

Fourth, as part of the Plea Agreement, she is agreeing to forfeit more than $20,000 in "substitute assets," specifically her inventory for her E-Commerce Sales Business that was seized by the government when it executed a search warrant and which she had bought with credit cards that she had to re-pay.[8]

And fifth, she has had to endure the stress and anxiety associated with the execution of a search warrant in her apartment and an investigation and Court process that has lasted nearly a year-and-half.

Even without a sentence of incarceration, it is unlikely anyone would look at Ms. Khatuntseva and think that she has not been substantially punished.

With respect to the need "to protect the public from further crimes of the defendant," we submit that there is virtually no risk that Ms. Khatuntseva, who has been crushed by this investigation and prosecution, will re-offend. To begin with, this offense was out of character for her. Furthermore, she has learned a harsh lesson in the form of the expense, embarrassment, stress and great burden this case has placed on her life. A woman of limited means to begin with, she has exhausted her modest life savings to pay the legal fees associated with this matter, leaving her with no reserve to pay her day-to-day living expenses, such as food, rent and insurance until she is again able to earn an income. After her plea in August, due to pre-sentencing restrictions imposed by the Probation Department, Ms. Khatuntseva was not permitted to continue her E-Commerce Sales Business – which, other than unemployment benefits which have now ended, had been her sole source of income since the beginning of the pandemic. She has been approved for food stamps and has no income for other expenditures. She

---

[8]  It is unlikely that the government will be able to effectively monetize those items such that they will return anywhere near the amount that Ms. Khatuntseva spent on them.  Moreover, the government has not committed to applying any proceeds of the re-sale of those items to Ms. Khatuntseva's restitution obligations.

is supporting herself with credit cards until such time as her travel business resumes; she has earned only about $67 from that business since the start of the pandemic.

A sentence of incarceration will serve little purpose in this case. Ms. Khatuntseva has been stripped of the means to support herself and she has forfeited much of her dignity. She has no spouse or partner to provide financial support to her. If she is incarcerated, she will have no means to maintain her rented apartment. Even more importantly, her ability to rebuild her travel business in this crucial late-pandemic period during which vacation travel is finally starting to resume will be hampered. It is unknown whether she would be able to recover from even a brief period of inactivity in that business; as the sole employee and the face of the company, she will be unable to rebuild the relationships that are necessary to the resumption of that business. In this way, a sentence of even a short period of incarceration will have an immense, lasting impact on her life in ways that may not be immediately apparent.

In contrast, a period of probation would permit Ms. Khatuntseva to perform the work that will be necessary to rebuild her business and generate an income to support herself, while simultaneously serving a significant punishment for the offense. To the extent that there is any concern that Ms. Khatuntseva's online business activities warrant oversight (and they should not, because there is no claim or evidence that either of her online businesses involved any type of fraud), a reporting structure or some other oversight by Probation could be arranged so as to ensure the Court that Ms. Khatuntseva's business activities comply with any Court requirements.

(d) The need to avoid unwarranted disparity among defendants with similar records who have been found guilty of similar conduct (Section 3553(a)(6))

As noted above, according to the U.S. Sentencing Commission's Sourcebook of Federal Sentencing Statistics for the years 2015- 2019, more than 50% of sentences for fraud offenses

were below the Guideline range. The mean sentences imposed on fraud offenders nationwide in 2018 and 2019 were more than 50% below the low end of the Guidelines range.

For all the reasons discussed above, this case should clearly be one of the fraud cases with a below-Guidelines sentence.

A recent case before this Court, involved a proposed sentence by the Court that was substantially below the Guidelines on case facts that were much more egregious than are present here. In *U.S. v. Walshe*, 18-CR-10399-DPW, this Court indicated that it was prepared to give the defendant an incarceration sentence of time served (i.e., several days in jail following the defendant's arrest) in a case in which the defendant, after a three-level reduction for pleading guilty, had a TOL of 19, correlating to a Guidelines range of 30 to 37 months.[9] The government had recommended a sentence of 30 months. The facts here compare favorably with those in *Walshe*. The *Walshe* defendant, who grew up with financial privilege, defrauded individuals out of property (unique artwork) and money totaling $465,000. The victims included a close friend, the defendant's dentist, and other individuals. The crime was greed-driven and at least one of the individual victims was caused great pain by the fraud inasmuch as the victim's father lost his retirement savings leading to an estrangement of father and son. The scheme was elaborate and devious, lasted nearly six years, and involved defrauding a friend into giving the defendant original artwork on consignment (which was never returned) and from which artwork the defendant commissioned forgeries that he sold to others. (*See generally* Government Sentencing Memorandum, Doc. #104). In addition, the defendant entered his guilty plea after the case had

---

[9] Before pronouncing sentence, the Court received certain last-minute information not disclosed on the written record that caused the Court to continue the sentencing while the information was investigated. On information and belief, the late information received by the Court did not relate to the underlying offense.

been pending for several years and a trial date was set, whereas Ms. Khatuntseva saved the Court's and government's resources by agreeing to waive indictment and plead guilty to an Information.[10]

(e) <u>The need to provide restitution to any victims of the offense (Section 3553(a)(7))</u>

In addition to the reasons identified above, a sentence of probation would permit Ms. Khatuntseva to get back to work faster in order to pay the restitution ordered in this case. The appropriate restitution amount is discussed below.

Finally, we ask the Court to consider the risk to Ms. Khatuntseva health that would result from incarcerating her during a deadly pandemic.

## H.  <u>Restitution</u>

The purpose of restitution is to make the victim whole, and restitution does not necessarily follow the U.S.S.G. loss calculation. Here, with respect to the Spreadsheet Transaction items, irrespective of the Court's determination of the U.S.S.G. "loss" amount, there is no evidence that TJ Maxx actually lost any money. Accordingly, there should be no restitution ordered with respect to the Spreadsheet items.

Insofar as the Held Items are concerned, Ms. Khatuntseva recognizes TJ Maxx's position that the store cannot re-sell them – even though they are items of value – due to questions about their provenance. Nevertheless, the Marshals will sell them as part of the forfeiture process and the U.S. Attorney's Office has agreed to seek permission from Main Justice to apply the proceeds of such sale to satisfy the restitution order (with no guarantee that Main Justice will

---

[10]  Ms. Khatuntseva's counsel recognizes the arguments made by Defendant Walshe's counsel in their pleadings, including that defendant had shown extraordinary rehabilitation between the time of the offense and sentencing and that he was prepared to make significant restitution at the time of sentencing and going forward. (Defendant's Sentencing Memorandum, Doc. #103)

agree). (Plea Agreement, Doc. #6, ¶ 5) Moreover, TJ Maxx will undoubtedly take a tax write-off for the loss, with TJ Maxx likely receiving a 21% benefit (the federal tax rate for corporations) for the value of those items.  Ms. Khatuntseva contends that she is responsible for $30,739.72 of the Held Items. She submits that a reasonable estimate of their value to TJ Maxx is $6,455.34 (21% of the $30,739.72). Accordingly, the Court should enter a restitution order of $24,284.38 ($30,739.72 minus $6,455.34) for the actual loss to TJMaxx related to the Held Items, plus $0 for the actual loss to TJMaxx related to the Spreadsheet Transaction Items, plus $1,450.49 for the actual loss to TJMaxx in credit card charges. Thus, the total actual loss for which TJMaxx should receive restitution is $25,734.87.

## I.  Ms. Khatuntseva's Request to be Permitted to Attend her Daughter's Wedding

In the event that the Court orders a sentence of incarceration or one which imposes other restrictions on her liberty, Ms. Khatuntseva requests that the Court impose the sentence in such a way that it will allow her to attend the wedding of her only child, her daughter with whom she shares a deep and close bond. The wedding is scheduled for April 16, 2022, and will go forward at that time with or without Ms. Khatuntseva's attendance.  If Ms. Khatuntseva is unable to attend, it will be an especially painful blow both for Ms. Khatuntseva and her daughter.

## CONCLUSION

For all the foregoing reasons, Ms. Khatuntseva submits that a sentence of probation is appropriate and would be fair, just, and "sufficient, but not more than necessary," to meet the sentencing goals enumerated in 18 U.S.C. § 3553(a).

Respectfully submitted,

TAMARA KHATUNTSEVA,
By her attorneys,

/s/ Peter E. Ball
Heather V. Baer, BBO #566746
Peter E. Ball, BBO #546031
FITCH LAW PARTNERS LLP
84 State Street, 11th Floor
Boston, MA 02109
(617)542-5542 tel.
(617)542-1542 facs.
hvb@fitchlp.com
peb@fitchlp.com

Dated: November 29, 2021

## CERTIFICATE OF SERVICE

I, Peter E. Ball, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on November 29, 2021 with a copy e-mailed to the U.S. Probation Department. There is no counsel who has appeared in the case who is not a registered participant in the ECF system.

/s/ Peter E. Ball
Peter E. Ball