UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | )   Cr. No. 21-10216-DPW |
| | ) |
| TAMARA KHATUNTSEVA | ) |
| | ) |
| Defendant | ) |

## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM

The United States of America, by and through its attorneys, Rachael S. Rollins, United States Attorney, and Assistant U.S. Attorneys Laura J. Kaplan and Carol Head, submit this supplemental sentencing memorandum.

On January 26, 2022, the Court held an evidentiary hearing to determine the amount of loss for purposes of the sentencing guidelines and restitution/forfeiture.  At the hearing, the defendant, FBI SA Grant Ferguson, and a representative from the victim company, Brian Burdick, testified.  The government submits that the loss amount for purposes of the sentencing guidelines and restitution is $126,155.71 while the amount for forfeiture is $123,657.82.  The defendant maintains the loss amount is $73,103.76 but argues for certain credits against the loss amount.  The total amount in dispute is $53,051.95.  At the conclusion of the hearing, the Court invited the parties to file supplemental briefings relevant to the loss amount and restitution.

## I.        The Loss Amount for Purposes of the Sentencing Guidelines

For crimes involving larceny, embezzlement, or other forms of theft, the Sentencing Guidelines recommend different offense levels based on the monetary loss associated with the offense. *See U.S. Sent'g Guidelines Manual* ("U.S.S.G.") § 2B1.1(b) (U.S. Sent'g Comm'n

2018).  In this context, "loss" can include both "actual" and "intended" loss.  *Id.* § 2B1.1 cmt. 3(A).  *See United States v. Rivera-Ortiz,* 14 F.4th 91 (1st Cir. 2021).

The government bears the burden of proving both actual and intended loss by a preponderance of the evidence, *see* 18 U.S.C. § 3664(e), and the government submits that it has met its burden of proof.  In addition, while it is generally the government's burden at sentencing to show the loss due to fraud, "where the government has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate. Otherwise, the district court may reasonably treat the entire claim for benefits as intended loss."  *United States v. Hebron*, 684 F.3d 552, 563 (5th Cir. 2012) (citing *United States v. Fisk*, 233 Fed. Appx. 371 (5th Cir. 2007)).  Here, because the fraud was so extensive and pervasive, the government seeks to treat all of the held and spreadsheet items as actual loss or, at a minimum, the held items as actual loss, and the spreadsheet items as intended loss.

### Items to Be Included In Loss Amount

#### A.  The Held Items

The government submits that the loss amount for the held items is $42,739.61.  These are the items that the victim took possession of at the direction of the FBI after defendant fraudulently presented them for a refund.  Defendant admits that of those items, $30,589.72 were fraudulently returned by her and disputes the remaining eleven items totaling $12,149.89.  Therefore, at least $30,589.72 is a calculable loss which must be included in the loss amount.

As to the disputed eleven items, the defendant's only explanation is that she does not remember buying or returning such items.  However, there is no reason to doubt the accuracy of the victim company when it identified these eleven items as fraudulent returns.  Mr. Burdick, the

victim company's loss investigator at the time, testified that once the FBI entered the investigation, all of the items returned by the defendant were held for the FBI. (Burdick TR[1]. 80, line 24 – page 81, line 1). He also testified that for all 45 items returned by the defendant and held, he reviewed the receipts for the returns and reviewed the videotapes of the returns wherein he was able to observe the defendant making the returns (Burdick TR.82, lines 22-25, page 83, lines 1-4), including the eleven disputed items. Therefore, the additional disputed eleven items totaling $12,149.89 is a calculable loss which must be included in the loss amount.

In addition, Mr. Burdick testified that the 45 held items were ***not*** the same items that the defendant had originally purchased. (Burdick TR. 83, lines 3-9). And there is no evidence to the contrary. These 45 held items have a known monetary value (Defendant's Exhibit C) and Mr. Burdick testified that once the merchandise was presented by the defendant to the victim for a refund, the victim could not, and did not, place the items back on the store floor for resale. (Burdick TR. 80, lines 10-15, page 82, lines 18-25, page 83, lines 1-9). For all of these reasons, all 45 held items, including the eleven disputed items, which are valued at $42,739.61, are clearly a calculable actual loss for the victim company and should be included in the loss amount.

**B. The Spreadsheet Items**

Defendant maintained a detailed spreadsheet of her purchases and returns. The government identified on the spreadsheet fraudulent returns based on the defendant's own entries that recorded the return of a similar but not identical item, which is consistent with her admitted fraud scheme where she returned a similar item in the place of the actual item i.e., a pink Gucci scarf vs. a pink floral Gucci scarf. Defendant admits that $41,066.58 of the $80,918.21 in returns

---

[1] TR is a reference to the transcript of the hearing conducted on January 26, 2022.

were fraudulent, and are therefore part of the calculable loss.  (Defendant's Exhibit B).
According to the defendant, 55 of the 96 return transactions on her spreadsheet were fraudulent
returns. (Defs.Aff., para 7, Defs., TR..7, line 19).  Thus, even by the defendant's own admission,
a loss in the amount of at least $41,066.58 must be included in the loss amount.

However, defendant argues that 41 of the spreadsheet transactions the government
identified as fraudulent were legitimate returns.  (Defs. Aff., para. 8).  The government submits
that defendant's explanation as to those 41 items is incredible especially where she has readily
admitted that 55 of the returns were fraudulent.  The situation the parties find themselves in at
this point was created by the defendant and her own recordkeeping which the government
submits was meticulous. However, because defendant's fraud was so pervasive, it is reasonable
to conclude that none of the spreadsheet returns at issue were legitimate and the full $80,918.21
should be included in the loss amount.

### Defendant's Testimony About the Loss Amount Should Not Be Credited

In her affidavit, letter to the Court, and at the hearing, the defendant attempted to
minimize her criminal conduct and fraudulent intent in order to persuade the Court that she
should be given credit for many of the fraudulent returns which would decrease the amount of
the loss.  Defendant's claim that she inaccurately recorded 41 items on her spreadsheet while 55
of the notations were recorded precisely simply does not ring true.  If some of the descriptions on
the spreadsheet differed, it is because they were not the same and were, in fact, fraudulent
returns.  This is the scheme that the defendant is charged with and pleaded guilty to—returning
similar, but not identical items. There is no evidence to credit defendant's testimony that her
spreadsheet was simply inaccurate.  The fact that the defendant kept such meticulous and
detailed records of her purchases and returns is, unfortunately for the defendant, the best

evidence and it speaks for itself.  It is an admission of wrongdoing.  The government's loss calculation was quite conservative and gave the defendant credit where the description of the item purchased matched the description of the item returned but there is simply no reason to believe that where the description of the returns and purchases differed that any of those items were legitimate returns.

Moreover, the testimony of the victim's former investigator, Brian Burdick, tells a different story.  Mr. Burdick testified that the defendant first came to his attention in 2018 (not five years prior) from management at various stores.  Mr. Burdick learned that the defendant was frequenting the Runway stores on a regular basis purchasing and returning high end merchandise.  Upon inspection of the returned items, it was noticed that the descriptions on the tags did not match the returned items and the tags were not in the correct place.  Mr. Burdick thereafter reviewed the defendant's various transactions and compared the receipts for the refunds and the actual refunded items to the original purchases and when they did not match, and after reviewing store videotapes, he pulled the items or had the items pulled from the sales floor. He thought he did this probably 45 plus times.  He testified that the company's policy, once it was determined that the purchased merchandise and item returned were not the same, and could not be authenticated, was to remove the items from the sales floor because those items could not be resold.  (Burdick TR. 76-80).

The merchandise that was pulled from the sales floor as a result of the defendant's fraudulent scheme can be monetized and is a calculable loss to the victim company.  This was not simply a matter of "inventory control"  but rather a necessary step to prevent an unwitting buyer from purchasing an item that was not what it was represented to be.  The government also

calls the Court's attention to the November 29, 2021, letter from the victim noting the significant

liability and loss suffered as a result of defendant's fraudulent scheme.  The letter notes:

> Organized retail crime…is on the rise throughout the US.  According to the National
> Retail Federation, these groups "use well-planed, proven methods that result in billions of
> dollars of losses each year as they move from store to store, across counties, and even
> through multiple states," and then resell the stolen goods "through sophisticated methods
> that can include merchandise repackaging, fencing operations, and illegal wholesale.

The letter goes on to point out that as a result of this type of fraud, such as the defendant pleaded

guilty to, retailers are being forced to implement new security measures, install and maintain

various camera technologies, and create specialized teams of investigators to conduct

surveillance.  This is all at considerable expense to the victim and not mere inventory control.

The Court has suggested that defendant's intent is not relevant for purposes of

determining the loss amount and restitution but the government submits it is relevant when

assessing whether to credit the defendant's testimony as well as to assist in calculating the

intended loss.  Defendant appears to now argue that her conduct was simply a result of trying to

circumvent the return policy of the victim company.  This is not consistent with the evidence.

First, the government did not bring this prosecution because it believed that the defendant was

aggressively circumventing the return policy of a retail store, although that in itself is fraud

where she was not returning the same items originally purchased.  This is a defendant who, for

many years, traveled multiple times a week to several of the victim's stores to purchase high end

merchandise.  She would then remove the price tag from the purchased merchandise and reattach

it to inferior merchandise.  At a later date, the defendant would return to the victim store and

request a refund for the inferior merchandise using the original purchase receipt and receive a

refund to her credit card for the full amount of the original purchase.  The defendant would then

sell the original purchased merchandise online using various platforms including eBay for full

retail for the sole purpose of making a significant profit for herself.  And she did this not by simply returning items outside of their return policy.  She did this by returning items to the victim company that were ***not*** purchased from the victim company, that was not their merchandise, that was of a lesser value, all while falsely representing (by placing on the items presented for refund security tags, price tags, and receipts from other merchandise) that she had purchased those items from the victim company as reflected on the receipt she presented to the victim company with the items.

Contrary to her affidavit and testimony, the defendant ***did*** intend to make a profit from her fraudulent returns.  On most occasions, the merchandise presented for a refund was ***not*** of equal value to the items originally purchased.  The returned items were purchased at outlets and were less expensive than those sold by the victim, yet the defendant received a full refund as if she had returned the original item described on the receipt.  Indeed, when asked whether she returned items of lesser value to the victim, the defendant admitted that she did not remember and she never calculated the exact number.  (Def. TR. 7, lines 23-25; 8, line 1).  Then, when asked if on the occasions that she returned an item of lesser value to the victim she received a refund for the higher amount, she replied, "yes."  (Def. TR. 8, lines 5-8).  To claim that the defendant did not intend to make a profit is simply implausible.  Why would the defendant engage in such a time consuming scheme if she were not trying to make a profit?  Why not just sell the items she purchased from the outlets on eBay?  The reason is obvious.  The defendant engaged in this fraudulent scheme because it was more profitable to do so.  In fact, at the time the search warrant was executed, and at the hearing, defendant admitted that she knew that what she was doing was fraud and illegal (Def. TR. 10, lines 5-7).

Further, her claim that she never intended to make a profit is belied by her testimony at the evidentiary hearing and in her affidavit.  She admitted, when asked whether she engaged in return fraud because it was more profitable, that "It was, but the difference was very small.  And, for example, I return items that I paid 1400 and got 1500, and I still have spent 1400 for the item that I actually need…" (Def. TR. 9, lines 3-9)[2].  When again questioned about whether she profited from the return of the items she presented for a refund because they were less expensive than the original items purchased at the victim's stores, she replied that, "yes, but at the time I did it, I didn't count it this way." (Def. TR. 9, lines 23-25; 10, line 1).   Needless to say, her statements are admissions that indeed she made a profit and undermines her sworn affidavit and testimony at the hearing refuting the same.  Her testimony that she did not intend to profit nor did she profit from this scheme is not believable and should not be credited.  Because the defendant cannot be trusted to tell the truth, the Court should reject her claim that the disputed items on her spreadsheet were actually legitimate returns and not fraudulent.

Additional evidence of the defendant's lack of candor was evident when she suggested at the hearing that the reason she purchased items from the outlets was to sell on eBay.  (Def. TR. 11, line 3).  While this might, on occasion, have been true, more often than not she purchased items from the outlets as part of her scheme to fraudulently present those items to the victim company for a refund.  She then sold the more expensive items she purchased from the victim company on eBay, not the items she purchased from the outlets, as can be seen in Government

---

[2] Defendant seems to believe that stealing $100 from the victim here and there is not significant.  However, it is not difficult to imagine how that number can exponentially grow when one multiplies $100 "here and there" hundreds of times over many years.

Exhibit 1 and was testified to by FBI SA Ferguson and Brian Burdick.  All, again, as a way to make a profit.

Moreover, in paragraph 2 of Defendant's Affidavit, she denied ever selling any item that was inauthentic, counterfeit or in any way different than the item she advertised it to be.  This is false.  At the hearing, the defendant admitted that that she did not tell the eBay purchasers how she came into possession of the items she was selling.  When questioned about whether the eBay purchaser knew she obtained the merchandise through fraud, defendant skirted the question and replied, "The buyer never asked me who is the owner."  (Def. TR. 17, line 21).  The government does not mean to suggest that the eBay buyer was defrauded, however, it seems likely the defendant was not the rightful owner of the property she sold on eBay because the items she sold on eBay were obtained through fraud.  This lack of candor is yet one more reason the Court should not credit the defendant's testimony that (1) she does not remember returning eleven of the held items and (2) that half of the returns she noted on the spreadsheet were legitimate returns and the others were just clerical errors.

Finally, the defendant's testimony that she witnessed representatives of the victim company returning items to the shelves is highly dubious.  (Def. TR. 24, line 7).  We know from common sense and our everyday life experience that when customers return merchandise to a store the item is not immediately returned to the shelves.  Cashiers do not abandon their register to place items back on the sales floor.  And, for that matter, it is not believable that the defendant waited around to observe whether the items were returned to the shelves.  It is equally unlikely and incredible that at some later date the defendant saw the returned item on the shelf.  Moreover, as previously noted, Brian Burdick testified that he actually did remove items, or had

items removed, from the sales floor that had been returned by the defendant.

**The Loss Amount is Calculable**

The government's loss amount is not exhaustive but the government's estimate is certainly reasonable. As FBI SA Ferguson testified, there were items seized from the defendant's residence and information about certain items on the defendant's spreadsheet that were not included in the loss amount because they could not be authenticated by the victim company. To the extent that additional fraudulent returns are not included in the loss amount, it is due to the extensive and pervasive nature of the fraud, which encompassed thousands of purchases, 83 of which the defendant admitted were fraudulent.

Again, the 45 held items that defendant fraudulently returned to the victim totaling $42,729.61 should be counted towards the loss amount because the victim had no alternative but to destroy the merchandise given its knowledge of defendant's fraud. Mr. Burdick testified that the victim company could not put items returned by the defendant back on the floor for resale because they could not be authenticated. Since the victim was working with the FBI, they knew that any items returned by the defendant were suspect and could not be resold.

The 96 spreadsheet items totaling $80,918.21 should also be counted towards the loss amount since these were intended losses caused by the defendant. At the time the defendant presented these items for a refund, she knew she was engaged in fraud and that there would be a loss to the victim. It matters not whether the victim was able to resell the merchandise. As the defendant stood at the cash register of the victim store presenting inferior merchandise purchased from another store for a refund, she intended to defraud the victim, and the loss occurred. The loss actually occurred at the time of the fraudulent return – when the defendant intended to defraud the victim company. In *United States v. Goldstein*, 442 F.3d 777 (2nd Cir. 2006), the

court held the defendant's intent was critical and that the loss should be "measured at the moment the credit cards were charged." *Id*. at 784.  The same is true here.  Had the victim been able to restock or resell some of the fraudulently returned items, and been refunded for its credit card fees, the loss amount would still be $126,155.71 since the loss is measured from the moment the items were fraudulently returned.

Finally, the credit card fees charged to the victim because of the defendant's fraudulent return scheme, totaling $2,497.89, should be included in the loss amount because the credit card fees were not returned to the victim.  This is a clearly calculable loss which should be included in the loss amount.

## II.    The Loss Amount for Purposes of Restitution

In a wire fraud case, such as this case, restitution is a mandatory component of sentencing.  The plain language of the Mandatory Victim Rights Act ("MVRA") requires restitution in cases where there are fraud victims "notwithstanding any other provision of law." 18 U.S.C. § 3663A(a)(1) ("notwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court shall order, in addition to … any other penalty authorized by law, that the defendant make restitution to the victim of the offense") (emphasis added).  The MVRA requires that victims be compensated "the full amount of their losses as determined by the court and without consideration of the economic circumstances of the defendant."  18 U.S.C. § 3664(f)(1)(A).

A restitution order pursuant to the MVRA is proper if it is "record-based and constitutes a fair appraisal of [the victim's] actual losses." *United States v. Gonzalez-Calderon*, 920 F.3d 83, 85 (1st Cir. 2019), *United States v. Naphaeng,* 906 F.3d 173, 182 (1st Cir. 2018).  Moreover, in *United States v. Kearney*, 672 F.3d 81, 100 (1st Cir. 2012), the court held that in calculating the

dollar figure owed in restitution the court need only make a "reasonable determination of appropriate restitution." *United States v. Innarelli*, 524 F.3d 286, 294 (1st Cir.2008) (quoting *United States v. Vaknin*, 112 F.3d 579, 587 (1st Cir.1997))  "Absolute precision" is not required. *Id.* (quoting *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir.2005)).  "[A] district court's calculation of restitution is not held to standards of scientific precision," *United States v. Sánchez-Maldonado*, 737 F.3d 826, 828 (1st Cir. 2013).

As set forth above, the total of the "held items" and the "spreadsheet items" is a reasonable, if not conservative, determination of the actual losses the victim  suffered, reflecting a "reasonable determination" of *the amount it paid out* to the defendant for fraudulently returned items and associated credit card fees which it incurred as a result of her fraudulent returns.

Defendant claims she is entitled to an offset for the value of the items fraudulently returned to the victim.  Not so.  As Brian Burdick testified, those items would not be resold, but had to be destroyed.

Nor is the property the defendant returned to the victim the same property that was purchased from the victim.  Thus, the offset provision of 18 U.S.C. § 3663A(b)(1)(B), providing that offender must pay an amount equal to the value of the property less "the value of any part of the property that is returned" does not apply.  As the Supreme Court held in *Robers v. United States*, "the statutory phrase 'any part of the property' refers only to the specific property lost by a victim."  572 U.S. 639, 640-41 (2014).  Here the defendant has not returned to the victim the specific property the victim lost (the money paid out to the defendant for the fraudulent returns, or the actual goods purchased from the victim associated with the actual receipt), but some other property of uncertain provenance.  She is not entitled to an offset for such property.

Finally, even if the defendant did see some items put back on the store floor, she cannot say for certain that those items were ever sold, and, if so, for what price.  (As Brian Burdick testified, items returned by the defendant would later be removed from the floor).  Thus, it would be wholly speculative to say that the victim realized anything at all from the fraudulently returned items that would warrant a credit against mandatory restitution.  Following *Robers*, for purpose of calculating restitution, "no 'part of the property' is 'returned' to the victim until the collateral is sold and the victim receives money from the sale."  *United States v. Foley*, 783 F.3d 7, 28 (1st Cir. 2015) (quoting *Robers*, 572 U.S. at 641); *see also United States v. Burks*, 678 F.3d 1190, 1199 (10th Cir. 2012) (holding that victim's actual loss as a result of stolen vehicle could not be offset by "speculative value of the vehicle" that was recovered, but not yet sold). Similarly, even when the government enforces restitution against an asset of the defendant's, the amount that is credited to restitution is the net proceeds realized after the sale or disposition of the asset less any costs incurred in that process, not  some other approximation of the value of the property.  This is because the purpose of the MVRA is to make victims whole.  For the same reasons, the defendant is not entitled to a credit for making fraudulent returns to the victim.

## III.    The Forfeiture Amount

Forfeiture is mandatory when a defendant is convicted of a criminal offense for which civil forfeiture is authorized.  *See* 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case.") (emphasis added); *United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied.").  Pursuant to her written plea agreement, the defendant agreed to a forfeiture money judgment in an amount equal to the restitution amount—

which is the amount of proceeds she obtained as a result of her fraud scheme. In its motion, the government, however, deducted the credit card fees incurred by the victim as those were not monies the defendant obtained as a result of her fraud. The government seeks a forfeiture money judgment in the amount of $123,657.82.

Defendant argues that she is entitled to an offset against any forfeiture amount because she "returned" items to the victim. Even if these items were of value to the victim, which the testimony of Brian Burdick refutes, that is irrelevant. The only question for forfeiture purposes is the amount of the gross proceeds she obtained and are traceable from her scheme to defraud. 18 U.S.C. § 981(a)(2)(A) defines proceeds for the offense of wire fraud, as "property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, ***and is not limited to the net gain or profit realized from the offense***." (Emphasis added.) *See United States v. George*, 886 F.3d 31, 40-41 (1st Cir. 2018) (discussing gross proceeds and forfeiture of ill-gotten gains); *United States v. Bucci*, 582 F.3d 108, 124 (1st Cir. 2009) (holding that "gross" refers to gross proceeds, not "gross profits" under the criminal forfeiture statute). As the First Circuit explained, "[f]orfeiture orders go beyond disgorgement of profits. They 'help to ensure that crime does not pay: [t]hey at once punish wrongdoing, deter future illegality, and 'lessen the economic power' of criminal enterprises.'" *United States v. Carpenter*, 941 F.3d 1, 10 (1st Cir. 2019) (quoting *Kaley v. United States*, 571 U.S. 320, 323 (2014) (quoting *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 630 (1989))). The government is entitled to forfeiture of the gross proceeds the defendant obtained, which is $123,657.82.

**III. Conclusion**

Defendant's fraud was extensive and pervasive.  It went on for several years, involved multiple bank accounts, several eBay accounts, numerous stores throughout the state, daily trips to these stores, thousands of purchases and returns, and hundreds of thousands of dollars. Because defendant's fraud was so extensive and pervasive and it is not reasonably practicable for the government to sort out with mathematical certainty which returns among hundreds were fraudulent and which were legitimate, it was the defendant's burden to produce evidence to refute the same. Since the defendant did not meet that burden, the total amount of loss sought by the government is $126,155.71 for purposes of the guidelines and restitution, and $123,657.82 for forfeiture.

Respectfully Submitted,

Rachael S. Rollins
 U.S. Attorney

By:     */s/ Laura J. Kaplan*
Laura J. Kaplan
Carol Head
Assistant U.S. Attorneys

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

 */s/ Laura J. Kaplan*
Laura J. Kaplan
 Assistant United States Attorney

Date: February 4, 2022